ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Tel: (206) 531-0841 / Fax: (206) 343-1526

MICHELLE GHAFAR (CA Bar No. 315842)
mghafar@earthjustice.org
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000 / Fax: (415) 217-2040
(Designated as counsel for service)

*Counsel for Center for Biological Diversity,*
*Friends of the Earth, and Sierra Club*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, and SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT; DEBRA HAALAND, in her capacity as Secretary of the U.S. Department of the Interior; and KAREN MOURITSEN, in her capacity as California State Director of the U.S. Bureau of Land Management, <br><br> Defendants. | Civ. No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This case challenges the U.S. Bureau of Land Management's (BLM's) hasty decision to sell the first oil and gas leases on public land in California in nearly a decade without taking the legally required hard look at the harmful impacts the leases will have on air quality, climate, imperiled species, the health of local communities, and precious groundwater resources in the area, as the law requires.

2.      In 2014, BLM's Bakersfield Field Office issued a resource management plan that opened over one million acres of public land and mineral estate across eight counties in California's southern Central Coast and Central Valley region to extensive oil and gas leasing and development, including hydraulic fracturing (or "fracking"). Fracking is a risky, environmentally harmful oil and gas stimulation technique whereby large volumes of hydraulic fracturing fluid—a mix of water, sand, and toxic chemicals—is injected down an oil or gas well under pressure great enough to fracture the surrounding rock formation.

3.      In 2016, the Central District of California held in *ForestWatch v. U.S. Bureau of Land Management*, No. CV-15-4378-MWF, 2016 WL 5172009, at *11–12 (C.D. Cal. Sept. 6, 2016), that BLM had failed to adequately analyze the impacts of fracking before opening this land to fossil fuel development, in violation of the National Environmental Policy Act (NEPA). In accordance with the court's order, BLM agreed to take a "hard look" at the impacts of fracking before authorizing any oil and gas activity.

4.      But rather than take the required hard look, BLM rushed through a hasty environmental review that ignored thousands of public comments from expert government agencies and community members, drastically undercounted the number of wells likely to be fracked, ignored the health risks of fracking to the surrounding communities, and failed to grapple with evidence that fracking will further pollute already scarce groundwater resources in the area. A diverse coalition of environmental justice, conservation, and business groups that will be harmed by BLM's careless expansion of oil and gas development are currently challenging the agency's environmental review in the Central District of California in *Center for Biological Diversity v. U.S. Bureau of Land*

*Management*, No. 2:20-CV-00371 DSF (C.D. Cal., filed Jan. 14, 2020), for its continuing failure to take the legally required hard look at the impacts of fracking.

5.     In December 2020, before the Central District could resolve the ongoing challenge to BLM's inadequate NEPA review, the agency barreled ahead with a lease sale in Kern County, California, an area already overwhelmed by oil and gas extraction and suffering from some of the worst air and water pollution problems in the country. BLM's rushed analysis of the sale's environmental impacts suffers from similar defects to those the Central District found characterized the agency's unlawful review of fracking. Moreover, BLM relied on the deficient past analysis in the resource management plan for the area, without supplementing the analysis or correcting those deficiencies. Because the agency failed to take a hard look at reasonably foreseeable impacts from the sale to air quality, climate, precious water resources, species, and the health and safety of local communities, the sale is unlawful and should be vacated.

## JURISDICTION AND VENUE

6.     This action arises under NEPA, 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, which waives the Defendants' sovereign immunity. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

7.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant). An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

8.     Venue is proper in this district court pursuant to 28 U.S.C. § 1391(e)(1) because officers of the United States are named defendants in their official capacities, and a substantial part of the federal land that is the subject of this action lies in this district. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the decision to issue the lease sale occurred in BLM offices in this district.

9.     Assignment to the Fresno Division of this district court is proper because this case challenges an oil and gas lease sale with parcels located in Kern County, which is covered by the Fresno Division. L.R. 120(d).

**PARTIES**

10.     Plaintiff Center for Biological Diversity (the Center) is a nonprofit organization with offices throughout the United States, including in Oakland and Los Angeles, California. The Center works through science, law, and policy to advocate for increased protections for California species and their habitats, a livable climate, and healthy communities by engaging at every step of federal fossil fuel planning, leasing, and development. The Center has over 84,000 members throughout the United States and the world, including those living in California and who live near and who visit the public lands affected by the challenged lease sale. The Center and its members and staff use public lands in the Bakersfield planning area for recreational, scientific, and aesthetic purposes. They also derive recreational, scientific, and aesthetic benefits from these lands, including through wildlife observation, study, and research. The Center and its members have an interest in preserving their ability to enjoy such activities in the future. As such, the Center and its members have an interest in helping to ensure their continued use and enjoyment of the activities on these lands. The Center brings this action on its own behalf and on behalf of its adversely affected members.

11.     Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation. It has offices in Berkeley, California and Washington, D.C. Friends of the Earth is a membership organization consisting of over 120,000 members, including more than 56,000 members who live in California. Additionally, Friends of the Earth has more than 1.5 million activist supporters on its email list throughout the United States, with more than 190,000 in California. It is also a member of Friends of the Earth International, which is a network of grassroots groups in seventy-four countries worldwide. Its mission is to protect our natural environment, including air, water, and land, and to achieve a healthier and more just world, using public education, advocacy, legislative processes, and litigation. Friends of the Earth is concerned about the adverse environmental and socioeconomic impacts from climate change and fossil fuel extraction, including harms to air quality, climate, imperiled species, the health of local communities, and precious groundwater resources. Therefore, on behalf of its members and activists, Friends of the Earth's Climate and Energy Program actively engages in advocacy to curb new oil and gas leases throughout

the United States as well as influence policy and law governing fossil fuel development. Friends of the Earth brings this action on its own behalf and on behalf of its adversely affected members.

12.     Plaintiff Sierra Club is a national nonprofit organization with sixty-five chapters and more than 842,510 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's Kern-Kaweah Chapter has approximately 882 members in Kern County. The Sierra Club has been actively working in California, including in Kern County, to address the serious threats to public health and the environment posed by the lack of oversight and safeguards for oil and gas drilling activities, including fracking. Sierra Club members live, work, and recreate in areas that will be adversely impacted by approval of the lease sale challenged herein. The Sierra Club brings this action on its own behalf and on behalf of its adversely affected members.

13.     Individual Plaintiffs and Plaintiff groups' boards, staff, and members live, work, and recreate in and around the federal lands at issue in this case. They will be adversely affected and irreparably harmed by BLM's issuance of the oil and gas leases. Plaintiffs' boards, staff, and members intend to continue to use and enjoy the public lands affected by the challenged lease sale for recreation, scientific research, aesthetic pursuits, and spiritual renewal frequently and on an ongoing basis in the future.

14.     Oil and gas development pursuant to the leases will degrade air quality and pollute and consume precious water resources used and enjoyed by Plaintiffs and their members. Oil and gas development will also harm Plaintiffs and their members by increasing heavy truck traffic, noise, visual blight, and air pollution, including increased emission of pollutants responsible for climate change, and threatening wildlife species. All of these harms will diminish Plaintiffs' ability to enjoy the recreational, spiritual, professional, aesthetic, educational, and other activities in and around the lands at issue in the challenged lease sale.

15.     Additionally, Plaintiffs and their respective boards, staff, and members have a substantial interest in ensuring that BLM complies with all applicable laws, including the procedural

requirements of NEPA. Plaintiff the Center participated extensively in BLM's decisionmaking around the Bakersfield resource management plan, and Plaintiffs the Center and Sierra Club participated in BLM's decisionmaking around the supplemental review of fracking. All Plaintiffs also participated extensively in BLM's administrative process for the lease sale, including commenting on the NEPA analysis and filing administrative appeals (known as "protests") of the lease sale. Plaintiffs have exhausted their administrative remedies.

16.     Plaintiffs' injuries are actual and concrete and would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law.

17.     Defendant United States Bureau of Land Management is an administrative agency within the United States Department of the Interior responsible for managing federal lands and subsurface mineral estates underlying federal, state, and private lands across the United States, including the land and mineral estate that is at issue in the challenged lease sale, and in that capacity is responsible for implementing and complying with applicable laws and regulations.

18.     Defendant Debra Haaland is sued in her official capacity as the Secretary of the United States Department of the Interior. As Secretary, Ms. Haaland is the official ultimately responsible for managing federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

19.     Defendant Karen Mouritsen is sued in her official capacity as the State Director of BLM in California. As State Director, Ms. Mouritsen is the official ultimately responsible for managing California's federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

## STATUTORY BACKGROUND

### I.     National Environmental Policy Act

20.     NEPA is "our basic national charter for protection of the environment." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (citation and quotation marks omitted).

21.     NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and

enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321. NEPA recognizes that "each person should enjoy a healthful environment" and requires that the federal government use all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." *Id.* § 4331(b)–(c).

22.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). Furthermore, the "'hard look' 'must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011).

23.     NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must, among other things, describe the "environmental impacts of the proposal," including the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1502.14 (1978),[1] 1508.7 (1978), 1508.8 (1978); 42 U.S.C. § 4332(C)(i).

---

[1] The Council on Environmental Quality amended its 1978 regulations implementing NEPA, effective September 14, 2020. Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,304 (July 16, 2020). BLM confirms that the new regulations do not apply to the oil and gas lease sale challenged herein because it was initiated prior to September 14, 2020. As a result, the agency has applied the previous 1978 regulations to the NEPA review for the lease sale.

24.    The EIS process is intended "to help public officials make decisions that are based on understanding of environmental consequences" and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b)–(c) (1978). "NEPA 'emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" *Ctr. for Biological Diversity*, 349 F.3d at 1166 (quoting *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072–73 (9th Cir. 2001)).

25.    Federal agencies must prepare a supplemental EIS (SEIS) whenever they are presented with "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1978). An SEIS must similarly take a "hard look" at the environmental impacts of proposed agency actions. *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 528–29 (9th Cir. 1997).

26.    All environmental analyses required by NEPA must be conducted "at the earliest possible time." 40 C.F.R. § 1501.2 (1978); *see also Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002) ("NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done.").

27.    To help determine whether an EIS is necessary, an agency may first prepare an environmental assessment (EA). 40 C.F.R. §§ 1501.3 (1978), 1501.4(b)–(c) (1978). If the agency determines, after preparing the EA, that the proposed action does not require preparation of an EIS, it must then prepare a finding of no significant impact (FONSI) detailing why the action "will not have a significant effect on the human environment." 40 C.F.R. §§ 1501.4(e) (1978), 1508.13 (1978); *see Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008) (describing procedure). If the EA indicates that the federal action "may" significantly affect the quality of the human environment, the agency must prepare an EIS. *See, e.g.*, *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004). In making this determination, BLM must "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas*

& *Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). "A determination that significant effects on the human environment will in fact occur is not essential. If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) (internal citation omitted).

28.     NEPA permits an agency to streamline its site-specific environmental analyses by incorporating by reference the general discussions of a prior, broader EIS through a process known as "tiering." 40 C.F.R. § 1508.28 (1978). An agency may "tier" the analysis in an EA for a specific proposed action to, or incorporate by reference, a broader-scope EIS, only if that broader EIS "fully analyzed" the proposed action's significant effects, including the direct, indirect, or cumulative effects. 43 C.F.R. § 46.140(c); 40 C.F.R. § 1508.28 (1978). "Tiering to the programmatic or broader-scope [EIS] would allow the preparation of an [EA] and a [FONSI] for the individual proposed action, *so long as any previously unanalyzed effects are not significant*." 43 C.F.R. § 46.140(c) (emphasis added). Where the relevant analysis in the EIS is not sufficiently comprehensive or adequate, the EIS "cannot save" the EA, which must explain any inadequacies and provide the necessary analysis. *Id.* § 46.140(b); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997–98 (9th Cir. 2004); *see also Kern*, 284 F.3d at 1078 ("If, as is the case here, there is no analysis in the EIS, the scope of the required analysis in the EA is correspondingly increased.").

29.     As part of its NEPA review, an agency is also required to prepare a detailed statement regarding the alternatives to a proposed action. *See* 42 U.S.C. § 4332(2)(C)(iii), (E). This analysis of alternatives to the proposed action is the "heart" of NEPA review. 40 C.F.R. § 1502.14 (1978); *see also id.* § 1508.9(b) (1978). Consideration of reasonable alternatives is necessary to ensure that the agency has considered all possible approaches to, and potential environmental impacts of, a particular project. *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971). "NEPA's alternatives requirement, therefore, ensures that the most intelligent, optimally beneficial decision will ultimately be made." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (internal quotation marks omitted). An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a)

(1978). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985) (internal citation omitted).

## II.   Administrative Procedure Act

30.   The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.* § 704.

31.   Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." *Id.* § 706(2)(B)–(F).

## FACTUAL BACKGROUND

## I.   The Public Lands at Issue in the Lease Sale

32.   BLM's Bakersfield Field Office administers federal land and mineral estate within the Bakersfield Field Office's "planning area"—an administrative geographic region of approximately seventeen million acres of land stretching from the coastal islands in the Pacific Ocean across the Central Valley to the crest of the Sierra Nevada Range. Federal land and mineral estate under the Bakersfield Field Office's jurisdiction falls within Kings, San Luis Obispo, Santa Barbara, Tulare, Ventura, Madera, eastern Fresno, and western Kern Counties.

33.   Within the planning area, the Bakersfield Field Office is directly responsible for the management of approximately 400,000 acres of public land and 1.2 million acres of subsurface mineral estate (the "decision area"). This property ranges in character from coastal urban areas near Los Padres National Forest, to dry expanses in the San Joaquin Valley, to rugged hills in the Sierra bioregion.

34.   The planning area is also at the epicenter of oil and gas drilling, including fracking, in California. California is one of the top oil-producing states in the United States, with much of this production occurring in Kern County and the larger San Joaquin Valley in the planning area,

including on land overseen by the Bakersfield Field Office. Kern County alone already experiences more than ninety-five percent of all federal oil and gas drilling in California, and is the source of eighty percent of all oil and gas produced in the state. Several of the largest oil fields in the country are also located in Kern County.

35.     Within one of the largest oil- and gas-producing regions in California, residents in the planning area, and Kern County in particular, suffer from serious air quality problems. The city of Bakersfield is ranked as one of several cities in the region with the worst air quality in the nation. Oil and gas facilities emit significant air pollution, including thirty percent of all sulfur oxides, over seventy percent of hydrogen sulfide, and eight percent of anthropogenic volatile organic compounds in the larger San Joaquin Valley, which in turn react with nitrogen oxides to create ozone. Much of Kern County is already in nonattainment with fine particulate matter and ozone air quality standards, and the County experiences some of the worst particulate matter pollution in the state. These pollutants cause serious health impacts, including heart problems, asthma, lung and pulmonary diseases, and premature death.

36.     Water scarcity is also an ever-present concern in the area. Groundwater is essential to agriculture and other sectors of the economy, and provides about seventy-five percent of Californians with at least some drinking water. Groundwater quality throughout the planning area is generally suitable for most urban and agricultural uses, and is valuable for that reason. Due to historic, multiyear drought conditions and surface water scarcity in California, reliance on groundwater has increased, consequently reducing groundwater availability. Groundwater overdraft is expected to continue to worsen into the future. Kern County also suffers from some of the worst groundwater threats and drinking water contamination problems in California. Oil and gas drilling and fracking, which will occur in close proximity to protected groundwater, pose a serious risk of contamination of already scarce supplies of usable water.

37.     Climate change has long shaped the planning area, and its effects are poised to intensify in the coming years and decades. Oil and gas production and combustion dominate as significant sources of greenhouse gas emissions and are primary drivers of climate change. Several of the most carbon-intensive oil fields in California are located in Kern County. Increased

greenhouse gas emissions will further exacerbate the severity and frequency of drought, which contributes to devastating wildfires in the area. The climate crisis also increases formation of ground-level ozone, which can lead to a host of serious health consequences.

38.     Kern County has significant minority and low-income populations that are disproportionately impacted by pollution from industrial agriculture, heavy diesel truck traffic, and intensive oil and gas development in the region. According to California's Environmental Protection Agency and the Office of Environmental Health Hazard Assessment, these "environmental justice" communities are statistically the most affected by pollution in the state, meaning they experience the most asthma emergency room visits, heart attacks, and low birth-weight infants, and have the highest levels of poverty and unemployment. The counties in the San Joaquin Valley in particular have the highest asthma rates for children in the entire state.

39.     Oil and gas production on public lands can also result in the destruction and fragmentation of habitat for rare, threatened, and endangered species. Kern County and the larger San Joaquin Valley are home to important imperiled and protected wildlife species. The San Joaquin kit fox, California condor, blunt-nosed lizard, giant kangaroo rat, and San Joaquin antelope squirrel all have habitat in the County and are threatened by the extensive oil and gas activity in the area. The Temblor legless lizard in particular is a rare species, listed as a Species of Special Concern in California, with a small restricted range in western Kern County. As a "microhabitat" specialist, with specific requirements for burrowing, this species faces existential threats from disturbances that alter the soil structure, soil moisture, or plant makeup of the lizard's habitat. Oil and gas development poses the primary threat to the species.

## II.     The Impacts of Oil and Gas Drilling and Fracking

40.     Conventional oil and gas extraction has degraded air quality in the planning area, contributed to global climate change, and threatened public lands as well as the health and safety of nearby communities already overburdened by pollution. Unconventional extraction techniques like fracking have worsened these impacts, and raised new concerns. As reserves in virtually all oil fields in the state rapidly dwindle, California's oil and gas industry has increasingly turned to unconventional and dangerous drilling methods like fracking both to expand the productivity of

existing wells and to maximize production from new wells. Fracking is widely used in the planning area.

41.     Both oil and gas drilling and fracking on public lands produce air pollution emissions including nitrogen oxides, sulfur dioxide, fine particulate matter, volatile organic compounds, and hazardous air pollutants. By 2035, oil and gas production could be the largest source of nitrogen oxides in Kern County, accounting for seventy percent of all emissions. Drilling and fracking activity in California occurs in areas already facing severe air quality problems, like the San Joaquin Valley Air Basin in the planning area. Additional activity will make it even more difficult to meet federal air quality standards.

42.     Climate change is scientifically established as a real and significant threat to the environment and humanity. Oil and gas production, and the fossil fuels produced as a result, generate significant emissions of greenhouse gases, such as carbon dioxide and methane, that cause global warming and climate change. Oil fields in Kern County produce some of the most carbon-intensive, or climate-damaging, crude oil in California.

43.     Groundwater contained in subsurface aquifers is a critically important resource that provides water for drinking, agriculture, and other uses, particularly in the Western United States. Groundwater aquifers with usable water can occur at great depths, including many thousands of feet below the surface. Climate change makes it even more important to protect potentially usable sources of groundwater. The warming climate is expected to increase demand for groundwater in coming years, putting greater pressure on current sources and requiring water from previously untapped groundwater sources. Oil and gas production requires large volumes of water, and the Kern Sub-basin is already a critically overdrawn aquifer. The oil and gas industry's increasing demand for water threatens the water sources for the small communities and domestic users in Kern County that rely on local groundwater. Drilling and fracking also threaten to contaminate precious groundwater resources in the area, including from use of unlined ponds to dispose of produced water—waste fluid that is produced from a well for the life of the well, and which must be separated and disposed.

44.     Imperiled species in Kern County have suffered significant habitat loss and fragmentation from oil and gas development. Reptiles such as the Temblor legless lizard that have

lower mobility and specialized microhabitats are especially vulnerable to local extinction. The lizard is currently known to persist at only four widely separated sites in the County. Over ninety percent of the lizard's range has already been developed, with a projected seven percent increase over the next thirty years, leaving little room for the species. Oil and gas development will likely propel the lizard to Critically Endangered or Extinct status in the near future. At least one of the parcels sold in the lease sale at issue falls directly within the known range of the Temblor legless lizard.

45. Finally, oil and gas drilling and fracking threaten the health of the already disproportionately pollution-burdened communities in the area. The wide array of air pollutants released during drilling and fracking are linked to a range of illnesses, including damage to the brain and nervous system, increased asthma attacks and other respiratory issues, birth defects, and cancer. In addition, the hundreds of chemicals used for oil and gas extraction are associated with cancer, reproductive harms, and cardiovascular and nervous system issues. Residents in the planning area bear the brunt of pollution and experience the highest rates of cardiovascular disease and low birth weights in the state.

46. The public health risk exposure to toxic air contaminants and chemicals is greatest near active oil and gas sites. Much of the oil and gas activity in Kern County occurs in close proximity to communities that disproportionately bear the resulting environmental pollution and negative health effects. Thirty-five percent of the County's 290,000 residents already live within a mile of at least one oil or gas well, and most of these residents that live near wells are Hispanic people. Overall, approximately twenty-five percent of oil and gas wells in Kern County are located in low-income communities. These environmental justice communities are exposed to significantly more air and water pollution than other parts of the state. Residents experience acute respiratory, neurological, and gastrointestinal symptoms from exposure to oil and gas operations, such as headaches, fatigue, burning eyes and throats, nausea, and nosebleeds, and sleep disturbance due to noise levels from oil and gas activity. They also experience higher rates of asthma, low birth weight, and cardiovascular disease than eighty percent of the state.

### III.    The Process of Oil and Gas Leasing on Public Land

47.    Under the Mineral Leasing Act and Federal Land Policy and Management Act, BLM manages oil and gas drilling on public lands using a three-stage process. *N.M. ex rel. Richardson v. U.S. Bureau of Land Mgmt.*, 565 F.3d 683, 689 n.1 (10th Cir. 2009) (describing process).

48.    In the first stage, BLM prepares, with public involvement, a "resource management plan" for each unit of public land within its jurisdiction. 43 U.S.C. § 1712(a). A resource management plan operates like a zoning plan, defining the allowable uses of public lands within the plan area. At the resource management plan stage, BLM generally determines what areas to make available for oil and gas leasing and under what conditions. *See Richardson*, 565 F.3d at 692 n.1. A management plan does not require leasing any specific lands. BLM typically prepares an EIS evaluating, in general terms, the expected environmental impacts of potential land management decisions made in management plans, including oil and gas development.

49.    In the second stage, oil and gas operators submit an "expression of interest" to nominate specific sites within the plan area for oil and gas leasing. 43 C.F.R. § 3120.1-1(e). BLM then decides whether those lands are eligible and, if so, makes them available through a competitive leasing process, subject to the requirements of the resource management plan. 43 U.S.C. § 1712(e); 43 C.F.R. § 1610.5-3(a); 43 C.F.R. Part 3120. Prior to sale, BLM typically prepares an environmental review evaluating the environmental impacts of the lease sale. BLM may also subject leases to terms and conditions—for example, in the form of lease "stipulations"—to protect the environment.

50.    In the third and final stage, which occurs after BLM holds the lease sale and issues the leases, lessees submit applications for permits to drill to BLM. 43 C.F.R. § 3162.3-1(c).

51.    The leasing stage represents a critical step in this process because issuance of a lease generally gives the lessee a right to use some of the land for oil and gas development. *Conner v. Burford*, 848 F.2d 1441, 1449–50 (9th Cir. 1988); *Sierra Club v. Peterson*, 717 F.2d 1409, 1414–15 (D.C. Cir. 1983). Typically, a lease represents an irreversible commitment of resources by conveying a right to develop the leased land and/or federally owned minerals. *Conner*, 848 F.2d at 1446, 1449–50. Issuing such leases limits BLM's ability to require additional protective measures in the future,

or to forego oil and gas development altogether on the leased land. *Id.* at 1449–50. For that reason, a full NEPA analysis is necessary prior to issuing a lease in order to address reasonably foreseeable impacts from development of that lease. *Id.* at 1449–51.

52.    Leases are issued for a primary term of ten years for a minimum rental bid of $2 per acre. 43 C.F.R. §§ 3120.1-2(c), 3120.2-1. Once a lease is producing oil or gas, the operator may hold it indefinitely, until it is abandoned.

## PROCEDURAL BACKGROUND

### I.    Plaintiffs' Ongoing Challenge to the SEIS

53.    In December 2014, BLM issued its record of decision adopting a revised resource management plan (2014 Plan) and accompanying final environmental impact statement (FEIS) for the Bakersfield Field Office decision area. The 2014 Plan opened up 1,011,470 acres of land in the decision area, including Kern County, to oil and gas leasing and development, encompassing nearly eighty-five percent of the area.

54.    In June 2015, Plaintiff the Center challenged BLM's 2014 Plan and FEIS under NEPA, arguing that the FEIS failed to take the requisite "hard look" at the environmental impacts of the 2014 Plan, including impacts from fracking. In September 2016, the Central District of California held that BLM failed to adequately analyze the impacts of fracking, set aside BLM's environmental review, and ordered it to prepare an SEIS "to examine the cumulative environmental impacts" of fracking "in a comprehensive manner." *ForestWatch*, 2016 WL 5172009, at *7, 11–13. In May 2017, the court approved a settlement agreement in which the parties agreed to partial remand without vacatur of the record of decision adopting the 2014 Plan. BLM agreed that pending its issuance of the new environmental review document considering the impacts of fracking, it would not hold any oil or gas lease sales within the decision area.

55.    In December 2019, in response to the settlement agreement, BLM issued its record of decision adopting the final SEIS evaluating fracking and reaffirming the portions of the 2014 record of decision set aside in *ForestWatch*, 2016 WL 5172009.

56.    During the public comment period, BLM received over 16,000 written comments on the SEIS, including detailed technical comments from expert government agencies like the U.S.

Environmental Protection Agency and U.S. Geological Survey, and extensive comments from Plaintiffs the Center and Sierra Club. The comments covered approximately thirty different topics and identified critical flaws in BLM's analysis of the impacts of fracking, including on air quality, climate, water resources, public health and safety, and environmental justice communities in the planning area. BLM did not directly respond to all commenters' concerns and, where it did respond, used repetitive, non-responsive boilerplate statements in its responses to comments in the final SEIS.

57. Because the SEIS concluded that the impacts from fracking would be negligible, BLM did not alter or amend the 2014 Plan or propose alternatives or mitigation measures to lessen the impacts from fracking. Because of this decision, approximately 1,011,470 acres of public land in the Bakersfield Field Office decision area, encompassing Kern County, are now open to oil and gas development, including fracking.

58. In January 2020, a diverse coalition of environmental justice, conservation, and business groups, including Plaintiffs the Center and Sierra Club, challenged the SEIS in the Central District of California. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 2:20-cv-00371 DSF (C.D. Cal., filed Jan. 14, 2020). The complaint specifically alleged that BLM continued to violate NEPA by failing to respond to extensive public comments on the SEIS, and by still failing to take a hard look at the impacts of fracking on air quality, climate, water, human health and safety, and local environmental justice communities in the decision area.

59. Plaintiffs in the SEIS challenge have raised several specific concerns related to BLM's continuing failure to take a proper hard look at the unique and heightened impacts of fracking on the communities, public lands, and environment in the region. First, Plaintiffs argued BLM unlawfully underestimated the risks from fracking by arbitrarily limiting its analysis to the small subset of zero to four new wells it predicted would be fracked on new federal leases, entirely excluding the vast majority of new wells authorized by the 2014 Plan on existing leases. By turning a blind eye to new wells on existing leases and therefore drastically undercounting the number of wells predicted to be fracked in the decision area, the SEIS unlawfully skewed the NEPA analysis for all issues and underestimated the significant impacts to air quality, climate, public health and safety, local environmental justice communities, and water resources.

60.     Second, Plaintiffs argued BLM failed to undertake an analysis of the cumulative impacts of fracking required by NEPA. BLM failed to evaluate fracking on new wells on existing federal leases, along with drilling and fracking on private and state land in the overall planning area, and any activity authorized by BLM's nearby Central Coast Field Office Resource Management Plan Amendment, which opened *another* several hundred thousand acres of federal land and mineral estate to oil and gas development and fracking adjacent to the Bakersfield Field Office decision area. By limiting its analysis to just zero to four new wells on new leases, BLM in particular ignored cumulative air emissions in an area already in nonattainment with federal air quality standards, as well as the cumulative impacts of greenhouse gas emissions from fracking. The earlier 2014 Plan and FEIS did not include this analysis either, as the *ForestWatch* court concluded when it set aside BLM's environmental review. *ForestWatch*, 2016 WL 5172009, at *7, 11–13.

61.     Third, Plaintiffs argued that BLM violated its duty under NEPA to take a hard look at whether the already overburdened communities in the planning area face increased public health and safety risks from fracking. The SEIS entirely ignored these impacts on these local environmental justice communities, as did the 2014 Plan and FEIS.

62.     Finally, Plaintiffs argued that BLM underestimated the serious impacts of fracking on groundwater in the decision area, disregarding substantial public comments and record evidence that fracking practices in California endanger drinking water supplies due to the close proximity of fracking to groundwater.

63.     In April 2020, the Central District consolidated Plaintiffs' challenge with the State of California's related challenge to the SEIS. *California v. Stout*, No. 2:20-CV-00504 DSF (C.D. Cal., filed Jan. 17, 2020). Both cases are now in summary judgment briefing.

## II.     The December 2020 Lease Sale

64.     In August 2020, while the challenges to the SEIS were still pending in the Central District, BLM proceeded to the next stage of its oil and gas management process and proposed its first oil and gas lease sale in California in eight years.

65.     The proposed lease sale included seven parcels totaling approximately 4,133 acres of public land within the Bakersfield Field Office planning area in Kern County. Six parcels are within three miles of existing, administrative oil field boundaries; one parcel is inside an existing oil field.

66.     During the public comment period, Plaintiffs in this case submitted comments on the draft EA for the lease sale. They identified critical flaws in the analysis and noted that the draft EA did not cure the deficiencies in the environmental analysis for the 2014 Plan.

67.     Plaintiffs criticized BLM for "tiering" the EA to (i.e. relying on) the deficient analysis in the 2014 Plan/FEIS and SEIS. They noted that the EA tiers to these documents' discussion of cumulative impacts, particularly cumulative air quality and climate impacts. As Plaintiffs explain in their challenge to the SEIS, however, neither the 2014 Plan and FEIS nor the SEIS adequately quantify and analyze cumulative air pollutant and greenhouse gas emissions. The draft EA failed to provide supplemental analysis or correct those deficiencies. Because BLM's tiered analysis failed to account for cumulative air pollutant and greenhouse gas emissions from wells on existing leases in the Bakersfield Field Office planning area, private and state land in the planning area, and BLM's nearby Central Coast Field Office Resource Management Plan Amendment, Plaintiffs noted the 2014 Plan/FEIS and SEIS cannot salvage the EA's failure to take a hard look at cumulative air pollution and climate impacts for the parcels at issue.

68.     With respect to air quality, Plaintiffs further noted that BLM's conclusion that emissions from the lease sale are minor failed to adequately disclose the health impacts of the toxic air pollutants emitted from oil and gas operations at every stage of production. Plaintiffs expressed concerns that this omission ignored the serious impacts of excess pollution in an area that already has some of the worst air quality in the country.

69.      Plaintiffs also expressed concerns that the draft EA acknowledged that climate change is happening and is caused by human activities, but failed to adequately address the reasonably foreseeable climate change impacts of the lease sale itself. Plaintiffs pointed out that BLM acknowledged that fossil fuel development contributes to climate change through emissions of greenhouse gases (especially carbon dioxide and methane) from development activities and combustion. They further pointed out that BLM acknowledged climate change is also having

impacts in California, including increased wildfires, increased threats to coastal development, reduction in winter snowpack, increased demand for water while reducing the water supply, and increased impacts to human health. Plaintiffs explained that the draft EA nonetheless did not accurately quantify and disclose the cumulative greenhouse gas emissions of the lease sale together with other conventional and fracked wells in the Bakersfield planning area.

70.     With respect to water resources, Plaintiffs noted that the draft EA underestimated the serious risks of groundwater overdraft at the local scale in Kern County, and failed to disclose and analyze the risk of contamination of precious groundwater resources due to drilling and fracking activity and from the prevalent use of unlined ponds in the area.

71.     With respect to community impacts, Plaintiffs explained that the draft EA did not even acknowledge that the communities within and around the planning area are already disproportionately impacted by air and groundwater pollution from industrial agriculture, heavy diesel truck traffic, and intensive oil and gas development in the region. Plaintiffs noted that residents in Kern County already live in close proximity to oil and gas activity, and that the proposed parcels were located very near several disadvantaged communities. Plaintiffs further noted that increased drilling and fracking will only exacerbate these disproportionately high and adverse impacts to these environmental justice communities, but that the draft EA failed entirely to include discussion of health and environmental impacts in its analysis.

72.     With respect to imperiled species, Plaintiffs pointed out the draft EA entirely ignored impacts to the Temblor legless lizard, despite its restricted range overlapping the proposed lease sale area and its status as a Species of Special Concern in California. Plaintiffs also pointed out that the lizard is a microhabitat specialist that, because of its burrowing habits, is very sensitive to disturbances that alter soil structure, soil moisture, or the plant makeup of its habitat, all of which are common with oil and gas drilling and fracking activity at any scale. Plaintiffs further noted that at least one lease parcel is within the Temblor legless lizard's known range, and that the species would be harmed by spills, increased traffic, and human disturbance on the lease parcels.

73.     Finally, Plaintiffs noted that despite NEPA's instruction to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a) (1978), the draft EA

neglected to evaluate reasonable alternatives that would have avoided significant impacts to water quality and climate. Plaintiffs further noted these alternatives could include declining to lease lands in areas overlying sensitive groundwater resources, adding further stipulations to protect groundwater, or deferring leasing of some or all parcels to protect the climate.

74.     In November 2020, BLM completed its protest period for the lease sale without issuing a final EA. Plaintiffs accordingly submitted protests that reiterated their comments on the draft EA.

75.     In December 2020, BLM dismissed all protests, issued a FONSI that concluded that an EIS is not necessary because the lease sale will not have significant environmental impacts beyond those already analyzed in the 2014 Plan/FEIS and SEIS, and adopted a record of decision offering the proposed parcels for sale. The agency also released its final EA for the lease sale. The final EA did not correct the deficiencies identified by Plaintiffs in their comment letters and protests.

76.     On December 10, 2020, BLM sold the seven lease parcels totaling 4,133 acres of public land in Kern County. The lease term for the parcels is ten years and may be extended for as long as oil and gas is produced in paying quantities.

## FIRST CLAIM FOR RELIEF

### (Violation of NEPA: Failure to Comply with Tiering Requirements)

77.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

78.     Pursuant to NEPA, federal agencies cannot "tier" their NEPA analysis in an EA for a specific proposed action to a programmatic or broader-scope EIS that fails to "fully analyze[]" the proposed action's significant effects, including the direct, indirect, or cumulative effects. 43 C.F.R. § 46.140(c); 40 C.F.R. § 1508.28 (1978). Tiering to a broader EIS allows for the preparation of an EA and the issuance of a FONSI only if "any previously unanalyzed effects are not significant." 43 C.F.R. § 46.140(c). Where the relevant analysis in the EIS is not sufficiently comprehensive or adequate, the EIS "cannot save" the EA, which must explain any inadequacies and provide the necessary analysis. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997–98; 43 C.F.R. § 46.140(b).

79.     BLM unlawfully avoided analyzing the cumulative air quality and climate impacts of the lease sale by tiering its EA for the lease sale to the 2014 Plan/FEIS and SEIS. The 2014 Plan/FEIS and SEIS did not adequately analyze the cumulative air quality and climate impacts of oil and gas leasing, and BLM's EA for the lease sale is therefore similarly inadequate because it did not cure the deficiencies in the prior NEPA review. The tiered analysis thus "cannot save" BLM's current leasing decision, which suffers from the same flaws and violates NEPA. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997–98.

80.     BLM's failure to disclose and adequately analyze all reasonably foreseeable impacts before it makes an irreversible commitment of resources by issuing oil and gas leases is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### SECOND CLAIM FOR RELIEF

### (Violation of NEPA: Failure to Analyze Environmental Impacts)

81.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

82.     NEPA requires BLM to take a "hard look" at all reasonably foreseeable environmental impacts and adverse effects of the proposed lease sale, including direct effects, indirect effects, and cumulative effects. *Robertson*, 490 U.S. at 349–50; 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7 (1978), 1508.8 (1978), 1508.9 (1978).

83.     BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the lease sale, including on:

  A.     air quality;

  B.     greenhouse gas emissions and the climate;

  C.     groundwater quantity and quality;

  D.     imperiled species;

  E.     human health and the environment; and

  F.     environmental justice communities.

84.     BLM's failure to disclose and adequately analyze the significant and adverse environmental impacts of its lease sale is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## THIRD CLAIM FOR RELIEF

### (Violation of NEPA: Failure to Consider Reasonable Alternatives)

85.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

86.     NEPA regulations require an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (1978). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Hodel*, 768 F.2d at 1057 (internal citation omitted). An agency fails to satisfy NEPA's alternatives requirement when it provides an inadequate explanation for not considering a party's proposed alternative. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813–14 (9th Cir. 1999).

87.     Groundwater contamination caused by oil and gas drilling and fracking, as well as climate pollution caused by the production of oil and gas resources, constitute unresolved conflicts concerning alternative uses of groundwater and subsurface mineral resources which require analysis by BLM under 40 C.F.R. § 1507.2(d) (1978).

88.     By evaluating only the proposed action and a no action alternative, BLM failed to consider reasonable and viable alternatives to the lease sale, including alternatives that would have prevented or minimized the impacts of oil and gas leasing on groundwater quality, climate change, and other resource values. BLM's failure deprives the public and agency decisionmakers of the information needed to make a fully informed decision and precludes analysis of all the environmental effects of the proposed action as required by NEPA.

89.     BLM's failure to consider reasonable alternatives to the lease sale is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

A. Issue a declaratory judgment that Defendants violated NEPA in approving the lease sale;

B. Issue an order setting aside as unlawful the decision record approving the lease sale, the underlying EA and FONSI, the protest decision, and all leases issued pursuant to such sale;

C. Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein;

D. Award qualified Plaintiffs their costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E. Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

Dated: March 22, 2021        /s/ Michelle Ghafar
MICHELLE GHAFAR (CA Bar No. 315842)
mghafar@earthjustice.org
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000 / Fax: (415) 217-2040

ELIZABETH B. FORSYTH (CA Bar No. 288311*)
eforsyth@earthjustice.org
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Tel: (206) 531-0841 / Fax: (206) 343-1526
*Admitted in California; not admitted in Washington

*Counsel for Center for Biological Diversity, Friends of the Earth, and Sierra Club*